**BURSOR & FISHER, P.A.**
Sarah N. Westcot
Stephen A. Beck
701 Brickell Avenue, Suite 2100
Miami, FL 33133
Telephone:  (305) 330-5512
Facsimile:  (305) 679-9006
Email:       swestcot@bursor.com
             sbeck@bursor.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| DANIEL MORENO and TAYLOR RUMMEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAGE DENTAL MANAGEMENT, LLC d/b/a SAGE DENTAL,<br><br>Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Daniel Moreno and Taylor Rummel (collectively, "Plaintiffs")

bring this class action complaint individually and on behalf of all others similarly

situated individuals (the "Class Members"), against Defendant Sage Dental

Management, LLC doing business as Sage Dental ("Defendant" or "Sage Dental").

1

Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and upon information and good faith belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Sage Dental patients who accessed dental services on the website https://mysagedental.com/ (the "Website").  Defendant purports to provide "the latest clinical technology . . . and the most affordable dental care" online and in-person to children/teens, adults, couples, and families in a variety of areas including general and cosmetic dentistry, orthodontics, teeth cleanings, dental implants, dentures, and oral surgery.[1]

2.      However, in pursuit of profit and without regard for their patients' medical privacy, Defendant aids, employs, agrees, and conspires with third parties LinkedIn Corporation ("LinkedIn") and Google, LLC ("Google") to intercept patients' communications as they seek dental services and book medical appointments on its Website.  This is achieved through Defendant's secret installation of complex computer code on the Website which serves to track and disclose Sage Dental's patients' activity, in real time, to third parties LinkedIn and Google.

---

[1] https://mysagedental.com/.

3. Confidentiality is paramount to the health and dental industries. Respecting a patient's decision to exercise their autonomy in providing personal and sensitive details about their health is vital in building trust with their clinicians. "The requirement for confidentiality is mentioned in all codes of ethics as well as the Hippocratic oath."[2]

4. When a patient pursues dental care, they are legally entitled to protection from the unauthorized disclosure of their information to third parties.

5. When patients know their information is secure, they are more likely to pursue important dental health services.

6. Information related to dental health treatment is protected by state and federal law, including but not limited to, the Health Insurance Portability and Accountability Act ("HIPAA") and Section 456.057 of the Florida Statutes. Dental healthcare providers, like Sage Dental, are legally required to safeguard patients' confidential and sensitive health information. This means that any data related to a patient's dental health and treatment history, including patient status, must be kept confidential and secure. Given these protections, patients reasonably expect that information related to their dental health treatment will remain confidential.

---

[2] https://www.dentalcare.com/en-us/ce-courses/ce510/confidentiality.

7.     Despite its legal and ethical duties to maintain its patients' confidential information, Defendant instead secretly discloses Plaintiffs' and Class Members' sensitive and confidential medical information with third parties.  In doing so, Defendant undermined the importance of safeguarding the identities and personal medical information of individuals seeking dental services and breached its patients' trust—violating state and federal law.

8.     Unbeknownst to Plaintiffs and Class Members, and contrary to Sage Dental's duties as a dental provider, Defendant discloses its patients' protected health information ("PHI") to third parties, including LinkedIn and Google, for targeted advertising purposes.  This PHI includes, but is not necessarily limited to, the patient's reason for appointment, location of appointment, time for appointment, and doctor name.  Plaintiffs bring this action for legal and equitable remedies resulting from Defendant's illegal actions.

## THE PARTIES

9.     Plaintiff Moreno is a resident of Winter Park, Florida.  In or around July 2024 Plaintiff Moreno used the Website to make an appointment for dental services with Sage Dental.  At all times relevant hereto, Plaintiff Moreno maintained active accounts on LinkedIn and Google.

10.     Plaintiff Rummel is a resident of Orlando, Florida.  In or around June 2023 Plaintiff Rummel used the Website to make an appointment for dental

services with Sage Dental.  At all times relevant hereto, Plaintiff Rummel maintained active accounts on LinkedIn and Google.

11.    Unbeknownst to Plaintiffs, Defendant disclosed their PHI—including the specific details about their dental appointments—to LinkedIn and Google for targeted advertising purposes.  These details included the time and location of their dental appointment, the reason for their appointment, and the specific dentist they were seeing.  Defendant also disclosed sufficient personally identifiable information ("PII") for LinkedIn and Google to identify Plaintiffs as the specific individuals booking their dental appointments, as described more thoroughly below.

12.    Plaintiffs used the same device and browser used to access their LinkedIn and Google accounts when booking their medical appointments on the Website.  After booking appointments on the Sage Dental Website, Plaintiffs began receiving targeted advertisements for similar products and services. Plaintiffs would not have booked an appointment on the Website if they knew Defendant was violating their privacy by sharing their PHI with unknown third parties.

13.    When registering for their LinkedIn accounts, LinkedIn required that they provide their full legal names, genders, and email accounts.  When registering for their Gmail accounts, Google required that they provide her full legal names,

5

date of births, and genders.  Every time Plaintiffs access their Gmail account, Google collects information related to their IP address and electronic device (e.g. browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes.  Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed below.  Google utilizes all of these tracking features in order to build robust consumer profiles it can then leverage for targeted advertising purposes.

14.    Defendant Sage Dental Management, LLC is a Florida-based LLC with its principal place of business in Boca Raton, Florida.  Defendant Sage Dental Management, LLC owns and operates the Website.  Defendant's Website connects patients with more than 140 practices across the southeastern United States, including its approximately 110 practices in Florida.[3]  Within this District alone there are more than 50 locations.

15.    Defendant chose to embed the LinkedIn Insight Tag and Google Analytics (the "Tracking Technologies") on the Website, whereby they disclosed the confidential PHI of their patients with LinkedIn and Google for targeted

---

[3] https://www.linkedin.com/company/sage-dental-southeast-florida/; https://mysagedental.com/sitemap/.

6

advertising purposes.  Defendant did this without authorization or consent from its patients.

## **JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiffs allege that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

17.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within this District and Defendant resides within the state.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred in this District and Defendant conducts substantial business within this District.  Further, the interception of Plaintiffs' personal information occurred in this District.

## FACTUAL ALLEGATIONS

### A.    Health Information is Sensitive and Confidential

19.    Defendant, through the Tracking Technologies, disclosed information that is sensitive, confidential, and personally identifiable to LinkedIn and Google, two of the largest data and technology companies in the world.

20.    Defendant owns and operates the Website where its patients can schedule dental appointments, including general and specialized dental care for a wide array of dental services.

21.    Under federal law, a healthcare provider may not disclose personally identifiable information ("PII") or PHI without the patient's express written authorization. [4]  In this case, PHI includes, but is not necessarily limited to, patient appointment information, including the provider the patient is seeing.

22.    The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients.  "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization." [5]

---

[4] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[5] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

8

23.    A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." [6]

24.    The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity…and the individual obtained or disclosed such information without authorization." *Id.*

25.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant because it is knowingly disclosing individually identifiable health information relating to its patients.

26.    Defendant further failed to comply with other HIPAA safeguard regulations as follows:

   a.  Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

   b.  Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

---

[6] 42 U.S.C. § 1320d-6.

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

e. Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

27. Health care organizations regulated under HIPAA, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors (as shown below). As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of**

**PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.** [7]

28.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others.  For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.  Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[8]

29.    Plaintiffs and Class Members face exactly the risks over which the government expresses concern.  Defendant's unlawful conduct resulted in third parties intercepting information relating to Plaintiffs and Class Members' dental appointments when they accessed Defendant's Website.

---

[7] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[8] *Id.* (emphasis added).

30.     The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

> This information might include an individual's medical record number, home or email address, or **dates of appointments**, as well **as an individual's IP address** or geographic location, medical device IDs**, or any unique identifying code.** [9]

31.     Crucially, the Bulletin continues:

> **All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI**, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as **IP address** or geographic location, does not include specific treatment or billing information like dates and types of health care services.  This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care. [10]

32.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies

---

[9] *Id.* (emphasis added).

[10] *Id.* (emphasis added).

integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection.  "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director.  "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities.  These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties.  For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.** [11]

---

[11] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking. (emphasis added).

33.    The FTC is unequivocal in its stance.  The FTC has specifically informed healthcare companies, like Defendant, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce.  This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.
>
> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.
>
> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act. [12]

34.    Therefore, Defendant's conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

## B.    LinkedIn's Advertising Technology

35.    LinkedIn markets itself as "the world's largest professional network on the internet[.]"[13]  But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network.  LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each

---

[12] https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach

[13] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

1 billion+ professionals around the world" via its Marketing Solutions services.[14]

Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of

the global ad revenue" which included approximately $5.91 billion in advertising

revenue in 2022.[15]

36.     According to LinkedIn, "[t]argeting is a foundational element of

running a successful advertising campaign — [g]etting your targeting right leads to

higher engagement, and ultimately, higher conversion rates." [16]  Targeting refers to

ensuring that advertisements are targeted to, and appear in front of, the target

demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions

services allow potential advertisers to "[b]uild strategic campaigns" targeting

specific users.[17]  LinkedIn's "marketing solutions allow advertisers to select

specific characteristics to help them reach their ideal audience.  The ads [users] see

on LinkedIn are then targeted to provide content relevant to [the users]."[18]

---

[14] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[15] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[16] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[17] LINKEDIN, *supra* note 13.

[18] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

37.    As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[19]

38.    The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, Predictive Audience, and LinkedIn Audience Network.[20]

39.    Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allow marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[21]

---

[19] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[20] *See id.*

[21] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-

40.     For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[22] According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement.  However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[23]

41.     In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[24]  That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[25]

42.     According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget

---

us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[22] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[23] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[24] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[25] Dencheva, *supra* note 14.

17

your website visitors, and learn more about your audiences."[26]  LinkedIn represents

that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and

unlock[s] valuable insights about your website visitors."[27]

43.    LinkedIn's current iteration of its Insight Tag is a JavaScript-based

code which allows for the installation of its software.[28]  A critical feature allows

the LinkedIn Insight Tag to track users, even when third-party cookies are

blocked.[29]  LinkedIn "recommend[s] using the JavaScript-based Insight Tag or

Conversions API" because third-party cookie settings are being deprecated across

the industry.[30]  Embedding the JavaScript as a first-party cookie causes users'

browsers to treat the LinkedIn Insight Tag as though it is offered by the website

being visited, rather than by LinkedIn.  Doing so ensures that the third-party

cookie-blocking functions of modern web browsers do not prevent LinkedIn from

collecting data through its software.[31]  Instead, the LinkedIn Insight Tag is shielded

with the same privacy exemptions offered to first-party cookies.

---

[26] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[27] LINKEDIN, LINKEDIN INSIGHT TAG FAQS,
https://www.linkedin.com/help/lms/answer/a427660.

[28] LINKEDIN, *supra* note 20.

[29] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[30] *See id.*

[31] *See id.*

44.    When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

45.    These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

46.    The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies.  Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[32]

47.    For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[33]  Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[34]

48.    A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Insight Tag, which

---

[32] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[33] *See id.*

[34] *See id.*

Defendant installed on the Website, LinkedIn is able to target its account holders for advertising.

49. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, LinkedIn expressly warrants the opposite. Similarly, Defendant never receives consent from their patients to share information with LinkedIn.

50. When first signing up, a user agrees to the User Agreement.[35] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[36] and the Cookie Policy.[37]

51. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[38]

52. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[39] LinkedIn

---

[35] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[36] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[37] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[38] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[39] *Id.*

states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[40]

53.     However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[41]

54.     Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**C.     Google's Advertising Technology**

55.     Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

56.     Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

---

[40] *Id.*

[41] *Id.* (emphasis added).

57.     Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

58.     Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- o HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- o Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- o HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request.  HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

59.      A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

60.     Every website is comprised of Markup and "Source Code."  Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

61.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  The Tracking Technologies embedded on the Website by Defendant constitutes Source Code and function in a substantially similar way.

62.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

63.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[42]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

---

[42] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

**Figure 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
| --- | --- | --- | --- |
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

64.    Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

65.    One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

66.    Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that

provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

67.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

68.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

69.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[43]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly

---

[43] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

analyze your data and collaborate with an easy-to-use interface and shareable reports."[44]

70.    Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when Sage Dental patients are booking their appointments.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

71.    In other words, when interacting with the Website, an HTTP Request is sent to Sage Dental's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's Tracking Technologies.

72.    Thus, Defendant is essentially handing their patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the

---

[44] *Id.*

tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties like Google.

73.    Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

74.    After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

75.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

76.    The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the medical services being received by the patient.  Google also received additional PII, including the patients' IP address, device information, and User-IDs.

77.    For example, the Website utilizes Google's "cid" or "Client ID" function to identify patients as they navigate the Website.[45]

78.    In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

79.    These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

80.    As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device

---

[45] https://www.owox.com/blog/use-cases/google-analytics-client-id#:~:text=The%20Client%20ID%20(cid)%20or,unique%20users%20using%20this%20paramet er.

they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[46]

81.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[47]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

82.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[48]

83.    Browser-fingerprints are personal identifiers.  Google Analytics can collect browser-fingerprints from website visitors.

84.    As enabled by Defendant, Google collects vast quantities of consumer data through Google Analytics.

85.    Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

---

[46] https://www.blog.google/products/chrome/building-a-more-private-web/

[47] https://www.pixelprivacy.com/resources/browser-fingerprinting/

[48] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

86.     Google then utilizes such information for its own purposes, such as targeted advertising.

**D.     Defendant Sage Dental Violates the Privacy Rights of its Patients**

87.     Defendant Sage Dental is a dental healthcare provider that uses its Website to connect patients with one of their 100+ locations across the southeastern United States.

88.     Defendant understands the information handled on its website is protected and confidential, as indicated by the Notice of Privacy Practices Health Information page on its Website where Defendant acknowledges "the practice is permitted by federal privacy laws to make uses and disclosures of your health information *for purposes of treatment, payment, and health care operations. Protected health information (PHI) is the information we create and obtain in providing our services to you.*" [49]

89.     Unfortunately, Defendant Sage Dental does not comply with its legal and ethical obligations.

---

[49] https://mysagedental.com/notice-of-privacy-practices-for-protected-health-information/ (emphasis added).

90.     Defendant allows its patients to access in-person and virtual dental

health services on the website, including the ability to book appointments on the

Website.  *See* Figure 1.



**Figure 1:** Screenshot of Defendant's Website
(confirmable with developer tools)

91.     Unbeknownst to their patients, Defendant disclosed sensitive details

about their dental appointments and personally identifiable information to

LinkedIn and Google through the Tracking Technologies.

31

92.    For example, patients can search for and schedule dental appointments on the Website.  A patient is then taken to a page to select the type of appointment. This information is simultaneously sent to LinkedIn. *See* Figure 2.



**Figure 2***: Screenshot of Defendant's Website with interceptions overlayed
(confirmable with developer tools)

93.    Patients are then taken to the page where they fill out their contact information, on this page information about the patient's date of birth is transmitted to LinkedIn. *See* Figure 3.



**Figure 3**: Screenshot of Defendant's Website with interceptions overlayed (confirmable with developer tools)

94.     The further the patient navigates, the more information Defendant discloses to LinkedIn.  For instance, Defendant discloses additional information about the provider, the day, and time of their appointment, etc. to LinkedIn. *See* Figure 4.

33



**Figure 4**: Screenshot of Defendant's Website with interceptions overlayed
(confirmable with developer tools)

95.    The information disclosed by Defendant was accompanied by the

lms_ads and li_sugr cookies, whereby LinkedIn could connect the disclosed PHI

with the patients' PII.

96.    The information shared by Defendant allows LinkedIn to know the

identities of specific individuals as well as information related to the reason they

are booking an appointment (e.g. a general dentist exam, an ortho consult, an

urgent/emergency, or an other appointment). *See* Figure 3. This allows these

companies, including Defendant, to profit from this information for targeted advertising purposes.

97. Defendant makes similar disclosures to Google, including the fact that a dental appointment is being made at a Sage Dental location.

98. During the booking process, Sage Dental assigns unique values to the selections made by its patients when sending the information to Google. However, Google can and does know the meaning behind the values disclosed by Sage Dental.

99. Defendant further assist Google by disclosing the PII of its patients sufficient for Google to uncover their identities. For instance, in HTTP communications, the patient's IP address is inherently included in every network request. In addition to its patients' IP addresses, Defendant, through Google Analytics, disclosed information about their specific devices and User-IDs to Google, allowing Google to link such information to an individual's specific identity.

100. Defendant also uses and causes the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications about their appointment details.

101. Defendant sent these identifiers (e.g. cid, IP address, and device information) with each patient's "event" data.

102. Such event data includes the fact that a patient is seeking medical treatment (i.e. dental services).

103. When patients share their personal information with medical professionals, they expect this information to be kept confidential. Moreover, when consumers seek a specific treatment from medical professionals, they also expect this highly sensitive information to be kept confidential.

104. If patients knew Defendant was sharing their personal information for targeted advertising purposes, they would seek treatment with another company. Through the above-listed third-party tracking services, which Defendant used via the software code installed, integrated and embedded into the Website, Defendant disclosed their patients' legally protected PII and PHI.

105. Defendant engages in this deceptive conduct for its own profit at the expense of their patients' privacy. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

**E. Tolling of Claims**

106. Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the Tracking Technologies into its Website.

107. The Tracking Technologies were and are entirely invisible to a website visitor.

108. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

109. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

110. Defendant had exclusive knowledge that its Website incorporated the Tracking Technologies and yet failed to disclose to its patients, including Plaintiffs and Class Members, that by booking dental appointments through the Website, Plaintiffs' and Class Members' PHI would be disclosed or released to LinkedIn and Google.

111. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' PHI. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients that it disclosed or released their PHI to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

112. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

37

113.    The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the Plaintiffs' complaint in this matter.

114.    Plaintiffs first discovered that Defendant had collected and disclosed their PHI to LinkedIn and Google on or around April 2025 after contacting undersigned counsel.

## CLASS ACTION ALLEGATIONS

115.    Plaintiffs bring this action on behalf of all persons in the United States who scheduled an appointment on the Website, https://mysagedental.com/ (the "Class").

116.    Plaintiffs also bring this action on behalf of all persons in Florida who scheduled an appointment on the Website, https://mysagedental.com/ (the "Florida Subclass").

117.    Excluded from the Classes are Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or had a controlling interest.

118.    Plaintiffs are members of the Classes they seek to represent.

119.   The Classes are so numerous that joinder of all members is impractical.  Although Plaintiffs do not yet know the exact size of the Classes, it is believed that there are at least thousands of Class Members.

120.   The Classes are ascertainable because the Class Members can be identified by objective criteria – all individuals who accessed https://mysagedental.com/ for dental services.  Individual notice can be provided to Class Members "who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

121.   There are numerous questions of law and fact common to the Classes, which predominate over any individual actions or issues, including but not limited to:

   a.  Whether Defendant gave the Class Members a reasonable expectation of privacy that their information was not being shared with third parties;

   b.  Whether Defendant's disclosure of information constitutes a violation of the claims asserted;

   c.  Whether Plaintiffs and Class Members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

d.  Whether Plaintiffs and Class Members have sustained damages as a result of Defendant's conduct and if so, what is the appropriate measure of damages or restitution.

122.   Plaintiffs' claims are typical of the claims of the members of the Classes, as all members are similarly affected by Defendant's wrongful conduct. Plaintiffs have no interests antagonistic to the interests of the other members of the Classes.  Plaintiffs and all members of the Classes have sustained economic injury arising out of Defendant's violations of law as alleged herein.

123.   Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

124.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system

40

presented by the complex legal and factual issues of this case.  Individualized litigation also presents potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

125.   Plaintiffs reserve the right to revise their allegations and class definition based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Florida Security of Communications Act**
**Fla. Stat. 934.01, *et seq.***

126.   Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

127.   Plaintiffs bring this Count individually and on behalf of the members of the Florida Subclass.

128.   The Florida Security of Communications Act ("FSCA") prohibits: (1) the interception or procurement of another to intercept any wire, oral or electronic communication; (2) the intentional disclosure of the contents of any wire, oral or electronic communication that the discloser knew or should have known was

41

obtained through the interception of a wire, oral or electronic communication; and (3) the intentional use of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication. Fla. Stat. 934.03(1).

129. Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, oral or electronic communication in violation of the FSCA is subject to a civil action for: (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. Fla. Stat. 934.10.

130. At all relevant times, Defendant procured Google and LinkedIn to contemporaneously track and intercept Plaintiffs' and Class Members' internet communications while navigating the Website. Defendant procured Google and LinkedIn to contemporaneously intercept these communications without authorization and consent from Plaintiffs and Class Members.

131. Defendant, when procuring Google and LinkedIn to intercept Plaintiffs' and Class Members' communications, intended Google and LinkedIn to contemporaneously learn the meaning of the content of Plaintiffs' and Class Members' communications with Defendant.

42

132.   Plaintiffs and Class Members had a justified and reasonable expectation under the circumstances that their electronic communications would not be intercepted.

133.   Plaintiffs and Class Members were not aware that their electronic communications were being intercepted by Google and LinkedIn and did not consent to the interception.

134.   In connection with procuring Google and LinkedIn's contemporaneous interception of Plaintiffs' and Class Members' communications with Defendant, Defendant embedded the Google and LinkedIn tracking tools on the Website.

135.   The Google and LinkedIn tracking tools constitute an electronic or other device through which the contents of a wire, oral and electronic communication can be acquired, including the contents of Plaintiffs' and Class Members' communications with Defendant via the Website.

## COUNT II
### Violation of the Electronic Communications Privacy Act ("ECPA")
### 18 U.S.C. § 2511(1) *et seq.*

136.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-126 above as if fully set forth herein.

137.   Plaintiffs bring this Count individually and on behalf of the members of the Class.

43

138. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

139. The ECPA protects both the sending and the receipt of communications.

140. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

141. The transmission of Plaintiffs' PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

142. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

143. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

144. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

145. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

146. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant, LinkedIn, and Google used to track Plaintiffs and Class Members communications while they were navigating the Website;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' mobile devices;

d. Defendant's, LinkedIn's, and Google's web and ad servers;

e. The plan Defendant, LinkedIn, and Google carried out to effectuate the tracking and interception of Plaintiffs' and Class Members'

communications while they were using a web browser to navigate the Website.

147. Plaintiffs' and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

148. By utilizing and embedding the Tracking Technology provided by LinkedIn and Google on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class Members in violation of 18 U.S.C. § 2511(1)(a).

149. Specifically, Defendant intercepted—in real time—Plaintiffs' and Class Members' electronic communications via the Tracking Technologies provided by LinkedIn and Google on its Website, which tracked, stored and unlawfully disclosed Plaintiffs' and Class Members' PII and PHI to third parties, such as LinkedIn and Google.

150. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI, including their identities and information related to the dental services they received. This confidential information is then monetized for targeted advertising purposes, among other things.

151.   By intentionally disclosing or endeavoring to disclose Plaintiffs' and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

152.   By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

153.   Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPPA and invasion of privacy, among others.

154.   The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3).  This provision

47

imposes a criminal penalty for knowingly disclosing individually identifiable

health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an
> individual, that—(A) is created or received by a health care provider ...
> (B) relates to the past, present, or future physical or mental health or
> condition of an individual, the provision of health care to an individual,
> or the past, present, or future payment for the provision of health care
> to an individual, and (i) identifies the individual; or (ii) with respect to
> which there is a reasonable basis to believe that the information can be
> used to identify the individual.[50]

155.   Plaintiffs' information that Defendant disclosed to Google and

LinkedIn qualifies as IIHI, and Defendant violated Plaintiffs' and Class Members'

expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct

through a violation of 42 U.S.C. § 1320d-6.  Defendant used the electronic

communications to increase its profit margins.  Defendant specifically used the

Tracking Technologies provided by LinkedIn and Google to track and utilize

Plaintiffs' and Class Members' PII and PHI for financial gain.

156.   Defendant was not acting under the color of law to intercept

Plaintiffs' and Class Members' wire or electronic communications.

157.   Plaintiffs and Class Members did not authorize Defendant to acquire

the content of their communications for purposes of invading Plaintiffs' and Class

Members' privacy.  Plaintiffs and Class Members, all of whom are patients of

---

[50] 42 U.S.C. § 1320d-6.

48

Defendant, had a reasonable expectation that Defendant would not redirect their communications to LinkedIn or Google without their knowledge or consent.

158. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

159. As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiffs seek statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq*. under 18 U.S.C. § 2520.

## <u>COUNT III</u>
### Breach of Confidence

160. Plaintiffs incorporate by reference the allegations contained in the paragraphs 1-126 above as if fully set forth herein.

161. Plaintiffs bring this Count individually and on behalf of the members of the Class and Florida Subclass.

162. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

163. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

164. Contrary to its duties as a medical provider, Defendant installed Tracking Tools to disclose and transmit Plaintiffs' and Class Members'

communications, including their PII and PHI, to third parties like LinkedIn and Google.

165. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

166. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

167. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

    b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c. Defendant eroded the essential confidential nature of the provider-patient relationship;

    d. General damages for invasion of their rights in an amount to be determined by a jury;

    e. Nominal damages for each independent violation;

f.   Defendant took something of value from Plaintiffs and Class
Members and derived benefit therefrom without Plaintiffs' and Class
Members' knowledge or informed consent and without compensation
for such data;

g.   Plaintiffs and Class Members did not get the full value of the medical
services for which they paid, which included Defendant's duty to
maintain confidentiality;

h.   Defendant's actions diminished the value of Plaintiffs' and Class
Members' PII and PHI; and

i.   Defendant's actions violated the property rights Plaintiffs and Class
Members have in their PII and PHI.

## COUNT IV
### Unjust Enrichment

168.   Plaintiffs incorporate by reference the allegations contained in the paragraphs 1-126 above as if fully set forth herein.

169.   Plaintiffs bring this Count individually and on behalf of the members of the Class and Florida Subclass.

170.   Defendant benefits from the use of Plaintiffs' and Class Members' PII and PHI and unjustly retained those benefits at their expense.

171.   Plaintiffs and Class Members conferred a benefit upon Defendant in the form of PII and PHI that Defendant collected from Plaintiffs and Class

51

Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

172. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

173. The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in Florida and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

174. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

    a.  Determining that this action is a proper class action;

    b.  For an order certifying the Classes, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorney(s) as Class Counsel to represent the Classes;

    c.  For an order declaring that Defendant's conduct violates the statutes referenced herein;

    d.  For an order finding in favor of Plaintiffs and the Classes on the counts asserted herein;

    e.  Awarding compensatory damages, including statutory damages where available, to Plaintiffs and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

    f.  For punitive damages, as warranted, in an amount to be determined at trial;

    g.  Ordering Defendant to disgorge revenues and profits wrongfully obtained;

    h.  For prejudgment interest on all amounts awarded;

53

i.  For injunctive relief as pleaded or as the Court may deem proper;

j.  For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

k.  Granting Plaintiffs and Class Members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

Dated:  June 13, 2025              Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:____/s/ Stephen A. Beck____
        Stephen A. Beck

Sarah N. Westcot
Stephen A. Beck
701 Brickell Avenue, Suite 2100
Miami, FL 33133
Telephone:  (305) 330-5512
Facsimile:  (305) 679-9006
Email:        swestcot@bursor.com
                  sbeck@bursor.com

*Counsel for Plaintiffs*

54